And counsel is appearing remote. Also, first we have Mr. Bentley. Good morning, Your Honor. Mr. Forbes, just so we'll have a sound check. Mr. Forbes, can everyone hear? Good morning, Your Honor. All right, and we can hear you. All right, first we'll hear from Mr. Bentley, and then we'll hear from Mr. Forbes. Good morning, Your Honors, and may it please the court. Michael Bentley on behalf of the appellant, Wexford Health Sources, Inc., with me on the briefs and also at virtual counsel table, although off of your screen is my colleague, Garner Vance. Your Honors, the district court certified two nationwide prisoner classes seeking damages and injunctive relief on the theory that the Constitution requires a particular intervention called MOUD for opioid use disease. The nationwide classes sweep in thousands of former and current prisoners spread across 11 states and roughly 100 individual prisons and jails. This unprecedented nationwide class action fails both Article III standing requirement, which requires all class members have a concrete injury, and Rule 23, in particular, the ascertainability, commonality, and predominance requirements. First, the damages class seeks pain and suffering damages for thousands of former inmates and jailees who claim they were not screened for opioid use disorder or provided MOUD. But the class definition sweeps in untold numbers of class members who have no injury. The first group would be class members who suffered no constitutional violation because even though they were under an alleged policy, the failure to provide MOUD or to provide screening in their particular case was not deliberate indifference, was not a constitutional violation, but was negligence, or was the result of what the district court recognized to be benign reasons. For example, an inmate who was not provided MOUD may not have been a candidate because of prior diversion or concerns about diversion that the sheriff or warden had that prevented that person from receiving MOUD. The other class... Aren't these, but what is, but couldn't these, and I know the hypotheticals you've given regarding the diversion, but wouldn't those be outliers? I don't think so, Your Honor, and there's a couple of responses to that. First, I agree we don't know how many of the class members are uninjured, but that's the plainest burden to demonstrate that they have satisfied the prerequisites of Rule 23, that they can satisfy the court's rigorous analysis that the class should be certified. But I think it's pretty reasonable to think that if you have a class of thousands of former inmates, a large number of them will have not suffered any concrete injury as a result of an allegedly unconstitutional policy. Well, wait a second. Are you saying that these people would have gone through opiate withdrawal without any injury? Is that what you're saying? No, Your Honor. Well, I guess I'm saying a couple of things. One, there has to be a constitutional injury. This is a deliberate indifference point. Well, and the injury, though, is they have to have an injury in fact. And the injury in fact of all the members of the class is that they had to go through opiate withdrawal without the treatment that they might have been entitled to. These people say there was a policy of not, essentially, not making medically-assisted opiate withdrawal available. And how can you say that someone went through opiate withdrawal without an injury? How can you say that? So that's not what we're saying, Your Honor, and I want to address that. Well, if that's the case, then there's an injury, isn't there? Correct, for that particular inmate. But what inmate is there not an inmate? Are you aware of people who were opiate addicts who stopped taking opium or opiates and did not have the problems of withdrawal? Well, the class, so no, Your Honor. Okay, so everybody in the class has that injury. Well, the class is defined. So let's just take the screening, failure to screen. Well, does everybody in the class have that injury of going through opiate withdrawal and having the pain and agony of that? No, Your Honor, the answer's no. Which, show me one inmate, show me one human in the history of the world that didn't go through opiate withdrawal without pain and suffering. Well, go to the medical. Yes, Your Honor, I'm not disagreeing with the fact that if you go through withdrawals, then that is the claim of injury here. And that is, as the evidence in this case confirms, that can be anything from severe to flu-like symptoms. What I'm saying is the class includes a failure to screen component. So that can be an inmate or a detainee who appears at the jail, has no symptoms, has already gone through withdrawals before they ever get to the facility, but they still have a OUD diagnosis. Well, do you have, in all, you've got access to all your clients' records. Did they identify anybody like that? Well, so again, Tell me the name of the person they identified with that, who went through, did not have withdrawal. So what I would point, Your Honor, to, I don't have a particular patient name in this case. I guess I would point to actually the named plaintiff, Smith, who was only in jail for nine days, who the evidence shows arrived on buprenorphine or MOUD. The prison facility said it should be continued, but she was released within nine days before she could ever start the treatment. There's no evidence as to that particular plaintiff about withdrawals. In fact, the evidence shows once she left the facility, she went straight back to the community provider and continued her MOUD. Did you argue the issue of standing below? We did, Your Honor. That was argued in our briefs, and it also was discussed significantly at the hearing on class certification. And in fact, the district court judge acknowledges the Article III issues and attempted to craft a more narrow definition based on those concerns. So I do want to try to answer Your Honor's question and then turn back to some of the other issues, because the failure to screen component in this class definition includes people who would have not been screened but would have suffered no damages as a result of that, no withdrawal symptoms, none of that, Your Honor. So I think that's an issue. Of course, you do have, again, this is a constitutional claim. So it's a deliberate and different standard, and the case law is clear in the Fourth Circuit and all circuits that injury in law is not injury in fact. So you have to prove a constitutional violation, deliberate indifference, that led to a concrete injury. And even taking the screening or the inmate who suffers withdrawals, we don't know whether that inmate, unless we go through many trials and conduct patient-specific inquiries, we don't know if that inmate suffered withdrawals because of deliberate indifference, which would be a constitutional violation, or negligence, which would not. And that's what makes these particular claims so unsuitable for class treatment. Well, haven't they alleged malpractice essentially as an alternative theory? No, Your Honor. This is purely a deliberate indifference constitutional. So what you're suggesting is that there would need to be a determination of injury for each and every potential class member at the class certification stage. And that is not what our circuit precedent says. In fact, we say that that question, the class can be certified, and that those are questions that remain for a later date. Well, I think what the cases say, I'm going to allay versus rocket mortgage is one of the court's most recent opinions. And Mr. Deese has a more recent opinion from this court in which that question is specifically left open, isn't it? Well, the question of whether you have to resolve the standing issue at the Rule 23 stage, I agree with that, Your Honor. I think Alley does that. I think Freeman versus Progressive does that. But in any event, even if you're not traveling under Article 3, you still have the Rule 23b3 predominance and superiority issues in a backward-looking damages class. And so just taking 23b3 and the predominance inquiry, obviously, if you're aggregating thousands of what are essentially personal injury claims, claims that I had pain and suffering as a result of withdrawals, like I was discussing with Judge Gidney, those are individual claims. My understanding is that your friend on the other side is no longer pursuing the pain and suffering as a basis for damages. We can clarify that when we get to him. But if that's true, does your argument still hold? So if that's true, I think there's a number of issues. And I recognize that in their appellate brief, the plaintiffs did attempt to disclaim pain and suffering damages and say they would present only their economist cost-benefit analysis. The first problem with that is that is not how Judge Chambers took this case and decided on it. And the second problem with that is if these three named plaintiffs are willing to wholly disclaim the pain and suffering damages that were pled and that have been the crux of their complaint up until this appeal, then there are serious adequacy and typicality issues in the case now. Although it seems like what they're saying is your client made money, more money, by neglecting to provide this treatment to individuals who are addicted to opioids. Essentially, I think the claim is that your client let people suffer without treatment that they were medically, that was medically necessary in order to make a lot of money. That's the claim. And so wouldn't that be, wouldn't that be a common claim and one that was every member of the alleged class suffered and every member of the alleged class was not provided the treatment and therefore your client essentially had an economic windfall on the basis of the failure to provide the treatment? So a couple of responses. I think that's the thing that Wexford prioritized profits over treatment. The claim, of course, is a section 1983 delivered indifference claim, which is, if you read this court's cases and particularly Price v. City of Charlotte, that's a tort, species of tort claim that travels under 1983. And the question has always been, do the damages you're claiming align with your theory of  And that's true in the class action context as well. You can look at Comcast v. Merriman, the Supreme Court's decision from 2013. It says you cannot present a formulated damages model that is wholly divorced from your theory of liability. That is not going to satisfy the rigorous analysis that has to be done under the predominance in superiority inquiry. So if the plaintiffs, the three named plaintiffs who purport to represent thousands of former inmates really aren't satisfied with whatever their portion of the cost-benefit damages would cash out at, that is a significant adequacy problem because they're purporting to represent class members who claim serious withdrawal symptoms, who claim personal injuries, potentially serious medical complications as a result of the withdrawal. And I think Judge Chambers, I think the arguments in the district court would have been quite different if plaintiffs were disclaiming any pain and suffering damages, despite maintaining those since the complaint was filed in 2023. But even— But the district court judge didn't really reach that question, so wouldn't it be appropriate for us to allow the district court judge to reach that question in the first place regarding the damages calculation? Well, I think if you are going to remand the case for consideration in light of the— if the concession is being accepted and the plaintiffs are stopped from ever seeking pain and suffering damages, yes, I think the district judge would need to consider that concession and we on remand would have serious concerns about adequacy of three-name plaintiffs who are willing to accept a formulated cost-benefit analysis. And again, I don't even think that would survive Comcast because what the plaintiffs are saying is—what they have to say under 1983 is, I have a delivered indifference claim, I was injured, I suffered personal injuries flowing from a particular policy or a particular enactment of that policy that caused me harm. The cost-benefit analysis that seeks to calculate what it would have cost or what it would cost to apply comprehensive MOUD across various facilities has nothing to do with my individual 1983 comments. So I think you run headlong into the Comcast dilemma that you can't just show up at class certification stage and come up with any old formulated damages method that's detached from your theory of libel. But again, I guess what I would emphasize is the ascertainability issues, the predominance issues when you have a nationwide prisoner damages class that all of whom have claims that they suffered a particular harm arising out of this policy. You've got to determine if that harm was delivered indifference or negligence. You've got to determine if they actually suffered any harm. And then, unless we're traveling under the conceded damages model, you've still got to have many trials on the back end to determine what each inmate's personal injuries were. And just quickly about the injunctive relief claim, I think it has not just an ascertainability issue for the same reason that the definition includes inmates who, prior to arriving at facilities, had a OUD diagnosis. Well, that is at the time of intake is the phrase the class uses, the class definition uses. Well, that is necessarily backward looking, well beyond any records that Wexford might have and probably beyond any records that the plaintiffs might have. And then the second part of the second difficulty with the injunctive relief class is that under Walmart versus Dukes, you have to have the same injury and there has to be a one-stroke remedy that the court could impose. Well, here, as we pointed out, the inmates in the injunctive relief class are spread across 100 individual jails and prisons, all of whom have differing local approaches, policies made by sheriffs, wardens, corrections officials about whether MOUD can be permitted at their particular facility. Because this involves bringing controlled substances into a prison and treating patients with controlled substances. So naturally, as the testimony showed, as there are security concerns, this isn't purely a medical context. Let me ask you a quick question. Yes, ma'am. Hard knows that you get, because I know that's one of the arguments that you all have made, I think, as Dan just animated the injunctive relief class, is that these policies are, that your policies are in response to the policies of these governmental entities, sheriffs or counties or cities. How many hard knows? Because it's my understanding that it's Wexler's position that they understand that this is the standard of care. So how many hard knows are you getting from these governmental entities that they're not going to follow the standard of care in terms of the policies? So, Judge Benjamin, the one we emphasize is St. Clair County, Illinois, which is still a hard know. This has changed over time as the district court's opinion sort of walks through. Because of Wexler's promotion and recommendations to facilities, I think Kaylee Mattis, a Wexler representative, estimates that now about 87% today, 87% of the facilities permit some form of MOUD treatment. At one time, facilities, going back to 2022, a lot of the facilities were forced withdrawal only. They did not allow MOUD. Then from 22 to 24, you started having some facilities that permitted continuation. So if a patient arrived with a buprenorphine prescription, they could continue it. They couldn't start MOUD in prison. And then today, you have more doing comprehensive. So it's a shifting period. And I think today, there's much less hard no's just because of Wexler's efforts and, of course, shifting views in the corrections community about MOUD and OUD. All right. Thank you. Judge Bentley, do you all have any additional questions? No, ma'am. Thank you. No, thank you. All right. Thank you, Mr. Bentley. Yes, sir. Mr. Forbes. Good morning, your honors. May it please the court. Jesse Forbes on behalf of plaintiff's appellees, Lawrence Burlock and others similarly situated. As the court recognized in the beginning of the argument, this is a class involving inmates and detainees, both pretrial and post-conviction, who were denied serious medical need treatment. Throughout Wexford's facilities. This is a private medical provider that takes hundreds of millions of dollars across the country and as part of those contracts, indicates that they will provide constitutionally sufficient medical care. It has to meet the standard of care. It doesn't matter whether the person suffers from OUD, diabetes, a heart condition, whatever that is, when they take on that state duty, they have the duty to provide that medical care. And what they've done here, and they really don't challenge it and never challenged it below, never challenged it with Judge Chambers, is that they acknowledge that these are serious medical conditions. They also acknowledge that they are not providing the treatment, the known standard of care. There's really been no challenge at all at this point. That is, it is the standard of care. What evidence do you have that Wexford treats all of the patients or inmates the same? So, Your Honor, that's exactly what we presented to Judge Chambers and it's in the appendix and briefing. Throughout their own internal presentations, from the top all the way down, their internal presentations, they acknowledge that it's the standard of care. They acknowledge that the facilities, and we tailored this in the class certification petition, the facilities that are in there, they do not provide that standard of care. They utilize forced withdrawal. We had testimony on it and through all their documentation. It hasn't been challenged at all with respect to those facilities. And that's why this is a narrowly tailored class. The damages class did not cover all 100 facilities. There were some that, prior to the date and time, had started providing care. But these facilities, they did not provide that care. They chose not to provide that care. And this is much different from the Walmart case or others where you have a situation where they have a policy to actually provide it and then they have individual, either managers or here, it would be health professionals, making some judgment call, whether it's good or bad, not to do it. This is an across-the-board policy. And that's what Judge Chambers found in a well-reasoned 37-page opinion. I mean, this is a case where we filed multiple definitions of what the class should look like. We had a lengthy hearing with Judge Chambers, and he ultimately and rightly rewrote the definition to make sure that ascertainability would not be an issue. And by doing that, by making this a tight definition, he has placed this where there is simply no question that the class members and the others similarly situated would be easily ascertainable and that their issues would predominate. And I want to address the damages argument. I want to ask you a question about the predominance while you're on predominance. How do we, what do we do with the fact that the facilities and the state laws have different policies and that those policies might be at play and potentially defeat predominance? Well, Your Honor, in order for that to be the case, there would have to be something in the record demonstrating that. As my friend was just asked about what facilities actually gave them a hard no, or any state laws where there was a hard no, they pointed to one, which when you actually go through the testimony, never gave them a formal hard no. It was they couldn't quite decide whether or not they were allowing it or not. So there isn't an institutional policy from the prisons. But even if there is, or from the state lawmakers or county lawmakers, even if there was, the fact that someone else is being constitutionally deficient does not absolve a private contractor who is promising through a contract to provide medical care to people that can't get it anywhere else. They can't walk out to a hospital. They can't walk out to a clinic. This is someone that is stuck there dependent on these people for every level of health care. This is a serious medical need. So either way, they would be responsible for their own actions. But the other thing that in the context of jail and prison medical law, that what you see across the country, particularly with Wexford is, is that their staff knows if they can't treat a condition at a facility, they are to send someone out for treatment. They do that at intake. They screen every single person that comes in. And if the person comes in and they screen with a heart condition or a certain type of condition that they're not medically capable of treating at the facility, they need to send them out for outside treatment. They didn't do any of that here. What they did instead was they understand it's a serious medical need, and then they force the people to suffer through the forced withdrawal. What about these hypotheticals that he's given regarding the, I guess, inmates or patients that are not, MOUD is not appropriate for. He, one of the hypotheticals is diversion. What's your response to those hypotheticals in terms of predominance? He's saying you're going to have to have individual trials because you have all of these other situations where MOUD may not be appropriate. You may not give it to someone because of the diversion issues and being in a prison setting. Thank you, Your Honor, and I appreciate that question. My friend here actually raised those exact same scenarios to Judge Chambers below. And what Judge Chambers did was take the initial definitions that we had started constructing, and he made it very clear in what he certified that you actually look, you screen for MOUD induction. And he addresses that in his opinion. He says he's not saying that the class necessarily, those people would receive MOUD. They need to be treated and assessed for MOUD induction. The policy across the board that was found by the district court that has lived and breathed with this case now for two years, the policy across the board was forced withdrawal. We don't screen them for MOUD. We don't consider it. There could be all sorts of medically important reasons not to place somebody on MOUD, and the district court recognized that in its order. But what it crafted the definition to include was that they need to be screened for that treatment. And that's what's vitally important is, is that they need to get the treatment that is the standard of care. This is a medical provider that promises to provide that care. You can't give deficient standard of care and meet the constitutional muster. And while I'm on this issue of predominance and the damages, I also want to point out, and rightly in the beginning of this from Judge Gibney, he noticed and indicated that all of these people will be suffering from withdrawal symptoms, which is horrific. I mean, anyone that's looked at this or understands what opioid withdrawals are knows that these are horrible symptoms. They can actually trigger independent medical strokes and heart attacks and all sorts of cardiac arrest and different conditions. And did you abandon the pain and suffering damages on appeal? Is that right? What we've said on appeal on the pain and suffering damages, Your Honor, is that we are not going to pursue the individual pain and suffering damages on a class-wide basis. Well, how can you then possibly represent all the people in the class? It seems to me that this business of how much money Wexford makes doesn't really have anything to do with how much do people suffer. I mean, Wexford could make billions of dollars from this and nobody could suffer. It wouldn't make any difference. There's a couple answers to that, Your Honor. First, this is a 1983 action for deliberate indifference. And as this court is well aware, there are potential damages, including the economic type of damages that our expert has laid out for the district court. How is that a damage to an inmate? The fact that Wexford makes money. Well, what our expert has said is that they've actually deprived the inmate or detainee of that medical care. And it has a direct economic impact on their ability for recovery and their ability down the road. It's broader than just the money that they make if you actually look at his report. But that doesn't need to be reached yet. And that's what the district court said. The district court said that whatever damages are here as a result of depriving this are linked to the deprivation. The constitutional deprivation is complete when they do not screen them and provide them the potential medical care. But you know, it's like any other tort. You have to have a breach of duty and you have to have damages. And in the 1983 context, Your Honor, in addition to traditional economic damages or even personal injury, pain and suffering damages in 1983, it's black letter law for 50 years. I think at this point there are potential nominal damages for a constitutional violation by itself. And there are potential punitive damages. And that was argued and raised in front of Judge Chambers at the hearing and in the briefing. And what he said is, is that he's looked at this in terms of what he needs to determine for predominance. But ultimately, working through the class definitions, if the class is successful, there would be a damages model that the court would have to approve. And so I think it's early to look at the specific damages that are here. But whatever damages flow from the injury, flow from that injury. And the injury is complete at the time of this deprivation. So it sounds like you would agree that Judge Chambers did not consider this economic damages theory of liability. Well, I would not, Your Honor. Because what he actually did, he had the expert's report. And the expert had differing categories of damages. And so while the expert did have a theory for pain and suffering damages, and these individuals could conceivably have pain and suffering damages on an individual basis, he said that he looked at the economic report, he looked at the expert testimony, and that he was satisfied that the predominance was there because whatever the damages were, which would be addressed later, at a later stage, whatever those were would flow from the injury that's already occurred. So it's not. And what we've attempted to do by making this clear on appeal is negate this argument that there would be a slew of mini-trials, ultimately, over what someone's injuries are. We've never intended these to be medical malpractice cases. The other side has recognized that. They recognize that in the court below. They're not medical malpractice cases. They're not, I mean, there's potential wrongful death cases out there. We don't believe those would be subsumed into the class. What we have attempted to do is narrowly construct this class so that we can address economic damages, nominal damages, punitive damages that may be there without getting into this argument, which we don't agree with about the mini-trials, because we think there is a matrix there. But to make this a more uniform and simple class to deal with, on appeal we made it clear that we do not intend to pursue the pain and suffering. And so with respect to your damages model, I've been trying to find other cases in the context of claims against health care providers that use this damages model in a class action case, and I was unable to find a case that did use this kind of damages model. Can you point us to any? Has a class been certified with this type of damages model? I think what you have to look at, Your Honor, is that because ordinarily when you're in the context of a medical provider, you're looking at either some sort of product liability issue or you're looking at a medical care itself issue, medical malpractice issues. Here, this is a 1983 claim. And so it really, what it runs through is the cases that involve damages for solitary confinement or other constitutional deprivation. And that's what we've tried to maintain here is that it's akin to those types of cases where you actually have a constitutional deprivation. And, you know, I think if you look at the Eighth Circuit cases that are in the briefing, the Pestaco case, and others that are there, it's similar to that. And it's also similar on that stage. I mean, we are at class certification. Even looking at Comcast, the district court doesn't have to decide what the damages are at class certification. It has to say they're aligned with whatever the injury was. The injury is complete at the time that this constitutionally deficient, deliberate indifference to a serious medical need takes place. And that takes place when they're not either continued on their prescribed medication or they're not screened for induction into MOUD. I mean, again, my friend never challenged and doesn't challenge. I don't believe here that the appropriate standard of medical care for someone suffering from OUD in the way that it's defined here should be to provide MOUD screening and treatment. And that's exactly what we've asked for here. I do want to turn... Can I ask you a question about injunctive relief? How are you going to get past the Lyons case? So, Your Honor, we believe that what we're asking for here is injunctive relief on a class-wide basis to essentially force this medical provider to provide constitutionally sufficient medical care. One thing I wanted to notice or note here is that one of the arguments that we've seen just for the first time on appeal, and they didn't place it in the district court where it would have been appropriate, is this argument about whether the representatives have standing in the injunctive relief class. First of all, these are extremely transient situations. You have inmates and detainees that are constantly going in and out of facilities. And the law has recognized that in those types of situations, you may not always have someone who's directly in a facility or in a place, and they could potentially be a class representative. But I would also note that with respect to Lauren Spurlock, she's been reincarcerated since the beginning of this case, faces potential reincarceration. And Sean Zudminsky was actually, it's my understanding, reincarcerated just in October, and is actually incarcerated again in New Mexico in what I understand to be a Wexford treated facility. So you think that because these people are addicted to opiates, it's unlike in the Lyons case where you'd have to show that the guy would get stopped again and choked again. It's likely that these people will wind up in the local correctional facilities where they reside and be suffered once again to go under Wexford's policy of no screening. Is that right? That's correct, Your Honor. These folks are in the same communities where Wexford still provides the care. And I think what we've seen here, just in the pendency of this case, is that at least two of them have been reincarcerated. One's incarcerated right now, is my understanding, as we sit here. And we even checked his records yesterday to confirm, again, he's still in a New Mexico facility that I believe to be Wexford treated. So, I mean, these are folks that are under either court supervision or potential probation or parole. They're also, to your point, in a community, in a situation where they continue to suffer the effects of the opioid epidemic, which, I mean, I'm from West Virginia. I know this court throughout this entire country, but particularly the area that the Fourth Circuit covers. This is the epicenter of the opioid epidemic. These folks are right in the middle of this. These are all findings of fact, and as a court of review, it just strikes me that these findings of fact are more appropriately made. The jurisdictional discovery and the jurisdictional findings of fact on the standing issue are more appropriately made at the district court level. Isn't that right? I absolutely agree, Your Honor. And they weren't raised there. I mean, that's the other issue. So, but now standing's being raised, and it's a matter of jurisdiction and a threshold matter that needs to be confirmed. And so it strikes me that it would be appropriate for us to send this question at least back to the district court in the first instance to determine whether, in fact, with respect to the injunction class, there is adequate standing alleged. And we understand. I mean, that's something that can be raised at any time, Your Honor. It's jurisdictional. So absolutely, the district court, I think, at any point is going to have to look at the standing issue. And so we understand that that would be addressed, but the district court, from what the record is before Your Honors, had sufficient information at that time. And to Judge Gibney's point, I mean, these people are inherently, unfortunately, in situations where folks who are incarcerated come and go and not at their own accord. I mean, there could be a court order that releases them one day. There could be a determination that they violate something and have to go back. They could be arrested. Given just the nature of their substance use disorder, they could be arrested and go back. But what I want to make clear here, Your Honors, is that Wexford Health takes hundreds of millions of dollars across this country to stand in the shoes of the government. They haven't pointed Judge Chambers to any concrete government that says they can't meet the standard of care. And frankly, if a concrete government entity decided tomorrow that they can't use something derived from stem cells or they decide that they can't use life supportive measures because of some political climate in a certain state, a medical provider cannot follow that. They have a duty at that point to say, we can't treat this person in this facility and send them out for appropriate treatment. Can I ask you a question about your 23C4 proposal? You say that this could be certified as an issue class. I've never encountered one of those. So how would that work? Your Honor, it's an alternative pleading in the event that the court would have concerns, which we don't believe there should be any concerns with the district court's ruling. It's an alternative pleading that would allow the district court to certify common issues amongst all the potential class members as opposed to a full blown damages class under three. So for instance, in this case then, what you would do would be attempt to prove that Wexford had a common policy that it applied across the country of not providing MOUD screening and as appropriate treatment. And then that that policy violated either the 8th or 14th amendment, depending on whether they were convicted or pretrial detainees. And then what would happen? Would those inmates have the right to bring suit on their behalf? And would that ruling be collateral estoppel on whether there is, in fact, a constitutional violation? Your Honor, I think at that point, the district court would have to determine whether there's also common damage issues that could be certified. And so it could go in stages, and I've seen that before, where it could go in stages of, okay, let's certify an issues class, and then ultimately they could look at whether there's common damages. There could also be situations where, yes, there could be a finding that then could be used later in the individual damage classes if you got there. But you don't need to get there here because these are all common issues, as the district court found. And so that's really just... And the district court, as we move forward, can make that determination. I mean, the district court can always redefine the class or determine, decertify a class and decide there's an issues class later. All of those are avenues that are open to the district court, which it's already considered in a 37-page, well-thought-out opinion way over time. But then an inmate saying... You can respond to Judge Gibney's question. Yes, Judge Gibney, you have another question. An inmate, say, in Martinsville could come in and say, well, I had to withdraw from opiates and the policy that they used was unconstitutional, therefore, all I should have to prove is my pain and suffering. Is that correct? Well, I think that still gets into a factually determinate issue. I mean, it would have to show that it met the exact issue that was in the class. And then I think it would be up to the court that you're trying to say somehow there's, to your point, either collateral estoppel or some reliance on that prior opinion. I think ordinarily in the class context, we would have it as an issues class. And then ultimately, the class members themselves would potentially be able to either through damage categories that could be issue-driven or potentially through some other form of trial or finding their damages could be looked at. If someone in some other facility that's not, you know, that's across the country somewhere would attempt to use it, I think it would have to be looked at factually to ensure that it really, their situation meets directly with what the finding in this case would be. Did you raise the C-4 issue at the district court? We did not generally raise that, Your Honor. I think we may have brought it up at one point in the argument as a potential alternative. I know that the court is extremely familiar with that as a potential there. And I think it was addressed, as I recall, in the argument. I don't have that in front of me. But what we'd asked for there was the damages class itself, which the court, again, you know, spent a lot of time going back and forth to make sure that the court was doing this in a way. And again, the 37-page opinion, it was well thought out after a lot of briefing and a long hearing on this to determine that it was appropriate in the facts and circumstances of this case. We would ask that, Your Honors, deny this motion, remand this case back, allow Judge Chambers to continue the work that he has done for years on this case. And if the case, if the class ultimately needs revised, that is something that's available to the district court board. Any other questions? No, thank you. All right. Thank you. Thank you, Your Honors. Yes. Yes, sir. OK, Mr. Forbes, you have, I mean, Mr. Bentley, you have some follow-up time for me. Thank you, Your Honor. Just a few quick points, if I can. First, I do want to start with the damages model discussion, because I think what plaintiffs are now proposing runs headlong into 1983 and the broadcast requirement under Rule 23. So I'll read from this court's opinion in Price v. City of Charlotte from 1996. The basic purpose of Section 1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights. And to receive compensatory damages, the plaintiff's damages must be grounded in determinations of plaintiff's actual losses. You combine that with Comcast, the Supreme Court's 2013 decision under Rule 23b that says you cannot show up at the class certification stage and have a damages theory that is wholly detached from your theory of liability. So what plaintiffs are doing that is contrary to both 1983 and Rule 23b-3, I don't think they can just scrap the type of damages that traditionally are sought and were pleaded in this case. And if they are doing that, then as we discussed, these named plaintiffs have a severe or serious adequacy and typicality issue that the district judge never had the opportunity to address. Turning to the class standing, the overall class definitions, all of this was raised and discussed with Judge Chambers. The hearing transcript is in the record. Judge Chambers questions counsel significantly about the number of uninjured patients and inmates that would be swept into the class definitions and attempts to refine the class to address that very concern. His opinion also mentions it. So these issues were in the case. Now we think Judge Chambers couldn't revise this class to meet the Rule 23b criteria, no matter how industrious he was and how hard he tried, because this is a conglomerate of personal injury claims at the end of the day. I do want to also note that there's been a lot of discussion by my friend about the standard of care, and we all agree that the standard of care is to provide MOUD, comprehensive MOUD. That's what Wexford recommends. Plaintiffs use Wexford's own guidance. They don't have their own expert in this case. They use Wexford's guidance to show what the standard of care is. But that's completely different than the constitutional delivered indifference standard. This Court has said over and over again, just like the Supreme Court and all circuits, that medical malpractice, a breach of the standard of care, is not the equivalent of delivered indifference. There has to be subjective recklessness. So all of these claims, simply deciding whether the policy is in line with the standard of care, does not resolve the thousands of individual delivered indifference claims, all of which depend on the inmate's individual experiences, the treatment he or she received, whether the treatment was simply negligent, which would not be a constitutional breach, or rose to the level of delivered indifference, and then if there were any harms at all. Well, it's not subjective recklessness. In the case of an Eighth Amendment claim, it's knowledge of, subjective knowledge that there is a dangerous condition that will harm this person. In the case of the Fourteenth Amendment case, you've got to have a reason to know. Isn't that right? That's correct. Yes, thank you, Your Honor. I mean, the delivered indifference standard in the Fourteenth Amendment context is a new or should have known standard. It's not an actual knowledge and disregard standard. But in any event, there's still a recklessness component. It's not simply breach of the standard of care of negligence. Thank you, Your Honor. All right. Thank you. And of course, we can't step down and greet you, but I want to say thank you on behalf of myself and Judge Berner and Judge Gibney. And at this time, we will, I think, Judge Berner, Judge Gibney, do you need a break? No, I think we can proceed to the third case. That's fine with me. John, will you get me a water, please?
judges: DeAndrea Gist Benjamin, Nicole G. Berner, John A. Gibney Jr.